NOLAN HEIMANN LLP
Jordan Susman, Esq. (SBN 246116)
Douglas E. Mirell (SBN 94169)
Jane Davidson, Esq. (SBN 326547)
16000 Ventura Boulevard, Suite 1200
Encino, California 91436
Telephone: (818) 574-5710
E-mail: jsusman@nolanheimann.com
      dmirell@nolanheimann.com
      jdavidson@nolanheimann.com

Attorneys for Plaintiffs
Jason Masimore and Brodbecks Law, PLLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JASON MASIMORE; BRODBECKS LAW, PLLC, | Case No.: |
| Plaintiffs, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| vs. | **1. DEFAMATION** |
| GAURAV KUMAR SRIVASTAVA, | **2. FALSE LIGHT INVASION OF PRIVACY** |
| Defendant. | **DEMAND FOR JURY TRIAL** |

Plaintiffs Jason Masimore and Brodbecks Law, PLLC, by and through their undersigned attorneys, allege upon knowledge as to themselves and their own acts and allege upon information and belief as to all other matters, bring this Complaint against Defendant Gaurav Kumar Srivastava and allege as follows:

## INTRODUCTION

1.      This is a defamation action against Gaurav Kumar Srivastava arising from false statements of fact he has made that impugn the professional character and ethics of Jason Masimore, a New York-admitted attorney and former U.S. Department of Justice prosecutor with the U.S. Attorney's Office for the Southern District of New York.

2.      Srivastava targeted Mr. Masimore and his New York-registered private law practice and sought to discredit them as part of a massive fraud and attempted extortion scheme against Mr. Masimore's client, Niels Troost, who was Srivastava's former business partner.

3.      From mid-2022 to mid-2023, through elaborate false pretenses, Srivastava defrauded Mr. Troost, a Dutch oil trader based in Switzerland, by posing as a CIA operative and convincing Mr. Troost that, together, they were pursuing projects important to Western national security and economic interests and approved at the highest levels of the U.S. Government—including to continue marketing Russian crude oil as part of a covert U.S. Government program to support the petrodollar and keep Russian oil exports flowing through friendly allies aligned with U.S. interests. As a result of Srivastava's fraud, Mr. Troost transferred half of his business ownership interests to Srivastava.

4.      But Srivastava was lying. He was not a CIA operative, and there was no secret government program to market Russian oil. Srivastava was after one thing—money. And he got lots of it, including $25 million he fraudulently stole from the business, laundered through international wire transfers orchestrated by his California personal attorney, and used to buy a $24.5 million estate in the Pacific Palisades.

5.      After Mr. Troost expelled Srivastava from his businesses in May 2023, Srivastava unleashed a worldwide campaign to disseminate false and negative information

about him. And when reputable investigative journalists began to expose Srivastava's crimes, he expanded his campaign to target Mr. Troost's wife and children. Srivastava paid tens of thousands of dollars to publish false and defamatory articles that accused Mr. Troost's wife of laundering money for Russian oligarchs tied to President Vladimir Putin. He created websites in her name and published YouTube videos maligning her. He also created false online posts about Mr. Troost's elder daughter and sent harassing anonymous emails to her employer in an effort to have her fired. Srivastava had people pose as journalists to run false stories on the Internet and pressure Mr. Troost's son's British college to expel him.

6.    As Srivastava's frauds unraveled, Mr. Troost retained Mr. Masimore, an experienced former federal prosecutor, to battle Srivastava and, ultimately, to marshal compelling evidence of Srivastava's criminal violations of Title 18, United States Code, Sections 371, 1343, 1349, 1951, 1952, 1956, 1957, and 1962, among other laws, and report him to U.S. authorities.

7.    Because Mr. Masimore and his work posed an existential danger to Srivastava's scheme, and because Srivastava was irate that major reputable publications, including *The Wall Street Journal* and *The Financial Times*, were beginning to report detailed evidence of his crimes, Srivastava targeted Mr. Masimore personally and tried to ruin Mr. Masimore and his law practice's professional reputation and livelihood.

8.    In or about mid-August 2024, Srivastava attempted to discredit Mr. Masimore by telling reporters investigating Srivastava's crimes at *The Wall Street Journal* and *The Financial Times* that Mr. Masimore's prior law firm had fired him for engaging in improper acts and professional malpractice while representing Mr. Troost. Such allegations are entirely false.

9.    Srivastava also created websites he used to malign Mr. Masimore, "sanctionnielstroost.com" and "jasonmasimore.com" (the "Defamatory Sites"). The latter masqueraded as Mr. Masimore's professional site and was optimized to appear at the top of searches for Mr. Masimore in order to cause maximum damage to his practice. In

addition, the Defamatory Sites defamed Mr. Masimore by falsely accusing him of committing crimes and alleging that he was directly connected to a sanctioned oligarch, a terrorist organization, and Vladimir Putin.

10.    Although Srivastava tried to conceal his nefarious actions with anonymous email addresses and general denials by unscrupulous lawyers, he inadvertently left evidence of his involvement, including a smoking-gun selfie of Mr. Troost that Mr. Troost had sent only to Srivastava, which then appeared on a YouTube video attacking Mr. Troost's wife. As these sites were all connected, it showed Srivastava was the person responsible for defaming Mr. Masimore.

11.    Srivastava's allegations against Mr. Masimore are demonstrably false. They are also malicious and reprehensible and therefore subject Srivastava to substantial compensatory and punitive damages in an amount sufficient to punish his tortious conduct and deter him from engaging in similar future conduct.

## THE PARTIES

12.    Plaintiff Brodbecks Law, PLLC is a professional limited liability company registered in the State of New York. Its sole member is Jason Masimore.

13.    Plaintiff Jason Masimore, a U.S. citizen born in 1974, is an attorney admitted to practice in the State of New York since May 2003. Mr. Masimore resides in New Jersey.

14.    Defendant Gaurav Kumar Srivastava is an Indian citizen born in 1990 and residing in California.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant, and the amount in controversy exceeds $75,000. Diversity of citizenship exists because Mr. Masimore is a citizen of New Jersey, Brodbecks Law is a citizen of New York, and Srivastava is a citizen of California.

16.    Personal jurisdiction over Defendant is proper because he is a resident of California.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this judicial district.

## OTHER RELEVANT PERSONS AND ENTITIES

18.    Niels Troost, a Dutch citizen and Swiss resident, is Srivastava's former business partner. Mr. Troost worked in the energy and commodities trading industries for more than three decades. Mr. Troost founded and is the sole ultimate owner of Paramount Energy & Commodities SA ("Paramount"), an energy and commodity trading company formed under the laws of, and with its principal place of business in, Switzerland. Mr. Troost owns Paramount through a Swiss holding company. Mr. Masimore has been Mr. Troost's lawyer in connection with disputes with Srivastava since approximately May 2023, first at the law firm of Kobre & Kim LLP, and then at Brodbecks Law.

19.    Mr. Troost built Paramount from the ground up. Until its last deliveries in September 2022, Paramount was actively involved in oil and commodities trading, primarily crude oil of Russian origin. At its peak, Paramount was worth hundreds of millions of dollars. Now, it is in liquidation.

20.    Mr. Troost's companies' success was largely the result of its strong relationship with an intermediary who sourced and aggregated crude oil from small, independently owned oil producers in Russia and his ability to aggregate smaller quantities of oil to fill large tankers at key ports, allowing Mr. Troost's companies to capture greater profit margins than firms that only marketed oil from large producers. Paramount was able to market that oil to refineries in China, based on its deep understanding of the Chinese market and strong network there.

21.    In 2020, Paramount Energy & Commodities DMCC ("PDMCC") was established in Dubai, UAE, by a third party. PDMCC shares were transferred to Paramount in early February 2022 (before the start of the war in Ukraine). It was from then on an independent wholly owned subsidiary of Paramount. In or around April 2022, PDMCC began marketing a type of high-quality Russian origin crude oil called "ESPO."

PDMCC stopped marketing Russian origin oil in early June 2023 and ceased deliveries in August 2023

22.  Charles C. Adams, Jr. is an attorney who represents Srivastava. He is registered to practice in Virginia and Washington, D.C. He is a partner at the Geneva, Switzerland, office of the law firm Orrick, Herrington & Sutcliffe LLP ("Orrick"). Formerly the head of Orrick's global international arbitration practice group, Adams is the former Ambassador Extraordinary and Plenipotentiary of the United States to the Republic of Finland.

23.  Mark Beeley is an English solicitor-advocate who also represents Srivastava. He is a partner at Orrick's London office, leading its global international arbitration practice group.

24.  On information and belief, Srivastava instructed Adams and Beeley to help him spread false and misleading information about Mr. Troost and his advisers, including Mr. Masimore, to journalists at *The Wall Street Journal* and *The Financial Times*. On behalf of Srivastava, they also reportedly presented incomplete and misleading information to officials of the European Union, the UK and other jurisdictions, some of which at least the EU later relied on to sanction Mr. Troost.

## **PLAINTIFFS' BACKGROUND**
### **Jason Masimore**

25.  Jason Masimore is an experienced litigator with over twenty-two years of practice. After earning bachelor's and master's degrees in music at Eastman School of Music and San Francisco Conservatory of Music, respectively, and performing violin professionally, Mr. Masimore earned his law degree *magna cum laude* from Georgetown University Law Center in May 2002, delivering the commencement speech for his section. He was an articles/notes editor for *The Georgetown Journal of Legal Ethics*. Mr. Masimore was admitted to the New York State Bar, First Judicial Department, in May 2003. He is also admitted before the United States District Courts for the Southern and

Eastern Districts of New York and the United States Court of Appeals for the Second Circuit.

26. From May 2002 through January 2009, Mr. Masimore was an associate attorney in the white-collar criminal defense group at Hughes Hubbard & Reed LLP in New York City.

27. From February 2009 through May 2016, Mr. Masimore served as an Assistant U.S. Attorney in the U.S. Attorney's Office for the Southern District of New York where he passed multiple FBI background checks. As a federal prosecutor, Mr. Masimore led large teams of FBI and other law enforcement agents, investigating and prosecuting high-profile cases involving fraud, international money laundering, organized crime, and public corruption, among others. In 2015, Mr. Masimore was lead prosecutor and trial counsel for the U.S. Government in its highly publicized first conviction of the then-New York State Senate Majority Leader and his adult son on bribery-related offenses. Before the United States Court of Appeals for the Second Circuit, Mr. Masimore briefed and successfully argued for the U.S. against a challenge to its effort to deport an Indian lawful permanent resident after a federal criminal conviction, among other cases. *See United States v. Chhabra*, 720 F.3d 395 (2d Cir. 2013).

28. In May 2016, Mr. Masimore returned to private practice at Kobre & Kim LLP, an international litigation firm headquartered in New York City. He was a partner based in its London office until May 2024, when he started his own solo practice, Brodbecks Law.

29. Mr. Masimore represents ultra-high-net-worth individuals and private companies in complex, multi-jurisdictional matters, often involving allegations of criminal conduct. Mr. Masimore has developed an excellent professional reputation. *Chambers*, a leading guide ranking lawyers in his field, has published third-party testimonials describing Mr. Masimore as "extremely clever" and having "a very sharp mind," "thoughtful and considered . . . not just a pit bull," and "tactically one of the best lawyers I've come across." Mr. Masimore's in-court examinations have been described

by *The New Yorker* as "devastating," and his trial advocacy has been detailed and recognized in the book, *Doing Justice*, by former U.S. Attorney Preet Bharara, as "smart," "something else," and showing "a masterful understanding of what other people need[ ] to understand, in an instant."

30.    Mr. Masimore has used his name to provide professional legal services continuously since May 2003.

### Brodbecks Law, PLLC

31.    In or around early 2024, a contact of Mr. Masimore's at an emerging business offered him a potential professional opportunity to become its general counsel. Accordingly, Mr. Masimore left Kobre & Kim at the end of May 2024 to prepare for the new opportunity while establishing his own, solo litigation practice, Brodbecks Law. Mr. Masimore does not provide transactional advice to clients.

32.    Brodbecks Law relies on Mr. Masimore's network of referral sources for its commercial success. As a new solo venture, Mr. Masimore's professional reputation is critical to Brodbecks Law's commercial success.

### FACTUAL BACKGROUND

33.    Many of the facts and evidence of Srivastava's fraud and attempted extortion against Mr. Troost can be found in Mr. Troost's recently filed lawsuit against Srivastava's crisis communications team, *Troost v. The Arkin Group DE LLC, et al.*, No. 25-CV-06487 (S.D.N.Y. Aug. 6, 2025) (Ex. 1) ("*Troost v. Arkin*"), which contains over 500 pages of exhibits, including documents, audio files, and sworn statements of 10 witnesses; the publicly filed legal malpractice complaint, *Paramount Energy & Commodities SA v. Baker & Hostetler LLP, et al.*, No. 24STCV11278 (Cal. Sup. Ct. May 6, 2024) (Ex. 2); and in articles published by *The Wall Street Journal* (Ex. 3), *The Financial Times* (Ex. 4), and *Project Brazen* (Ex. 5), as well as *Politico*, *The New York Post*, and elsewhere.

34.    The details and evidence of Srivastava's fraud and attempted extortion against Mr. Masimore's client in *Troost v. Arkin*, highly summarized below: (1) demonstrate that the defamatory statements about Mr. Masimore are false and that he did

not participate in crimes or in carrying out a disinformation campaign against Srivastava; (2) prove that Srivastava is responsible for the content on the anonymous Defamatory Sites; (3) establish Srivastava's motive to defame Mr. Masimore; (4) demonstrate Srivastava's ill will and vindictive intent; (5) support the amount of punitive and other damages Srivastava should pay; (6) rebut the false counternarrative recently disseminated by Srivastava on his official sites, X, and in podcasts, which he would likely otherwise attempt to present as a defense to this action; and (7) are needed to prevent Srivastava and anyone acting on his behalf from further defaming Mr. Masimore.

## Srivastava's Fake CIA Operative Fraud

35.    Long before Mr. Troost met him, Srivastava represented to various people that he was a CIA operative.

36.    For example, in or about 2020, a business contact of Habib Kagimu, a prominent Ugandan businessman and diplomat, introduced Mr. Kagimu to Srivastava as someone who worked with the CIA. Srivastava told Mr. Kagimu that he was recruited by the CIA when he was 16 years old after responding to a roadside advertisement. He said the CIA gave him military and special training to carry out CIA operations in Afghanistan. Srivastava said he had saved former governor Abdul Quayom Rahimi of the Afghan province of Herat during a CIA operation. Srivastava connected Mr. Kagimu with Governor Rahimi by phone, and the person claiming to be Governor Rahimi said Srivastava was his "savior" who had gotten him safely out of Afghanistan. Srivastava also showed Mr. Kagimu scars on his body which he claimed to have sustained during one of his special CIA missions.

37.    Srivastava told Mr. Kagimu in or around 2020 that he was working with the CIA to help the U.S. Government to rescue Paul Rusesbagina, a Rwandan human rights activist who had been arrested in Rwanda. Srivastava asked Mr. Kagimu to contact Rwandan President Paul Kagame to convince the government to release Mr. Rusesbagina. When Mr. Kagimu did so, the Rwandan government was confused why the U.S. Government would make a request this way, rather than through its embassy. Srivastava

told Mr. Kagimu that it was because the project fell under Srivastava's authority within the CIA's special operations division, rather than embassy staff.

38.    Srivastava told Mr. Kagimu and provided him with documentary evidence showing that in 2021 to 2022, his purported front company for the CIA, Unity Resources Group, provided training and support to the Sudanese Rapid Support Forces, a genocidal organization) led by General Mohamed Hamdan Dagalo, who has been sanctioned in the U.S.:



**Strength in Unity**

Unity Resources Group

June 7, 2022

Dear General Dagalo

I write to you today regrettably to inform you of a matter that has kept me up for several months. It is my internal conscious and conviction that finally pushed me to tell you about the following matter.

General, it is important for you to know that the gentleman Mr. Mohmad Noor who collected the funds on two occasions has stolen the money.
Me. Mohmad Noor is a cousin of Al Hajj Habib Kagimu and portrayed to me to have a long working relationship. Myself personally or my company has never worked with in any capacity.

Because he Is a relative of Mr. Habib Kagimu and Mr. Habib Kagimu explicitly said he can be trusted , we entrusted him with collecting the funds.

With deep grief , I would like to inform you of the 3 million you have given to Unity, only 1.2 million was ever received by us.
Mr. Mohmad Noor claims his wife has stolen close to 1 million dollars and he still has the remainder of the money with him.

I must inform you I have personally funded the programs while my people were in Khartoum and all other activities in the USA, hoping that Mr. Mohmad Noor on the assurance of the Mr. Habib Kagimu will follow though but he has not.

Mr. Mohmad Noor refuses to pick up my phone or respond to my messages.
At this moment of time, I do not know what to do but seek your guidance on the matter.

Thank You

Kind Regards
Gaurav Srivastava

Unity Resources Group          www.Unityresourcegroup.com          11601 Wilshire Blvd. Los Angeles, California 90025

**Srivastava Cons Mr. Troost Into Giving Him 50% Ownership Of His Companies**

39.    As explained in detail in *Troost v. Arkin*, in early May 2022, Mr. Kagimu first introduced Srivastava to Mr. Troost via phone.

40.    In July 2022, Mr. Troost met Srivastava in person in Indonesia and ultimately, over several weeks, spent several days with him there.

41.    Srivastava explained to Mr. Troost that he and his companies could either be sanctioned by the U.S. or work alongside Srivastava for the U.S. Government as part of a covert, OFAC-licensed,[1] U.S. Government program to support the petrodollar and keep Russian oil exports flowing through allies aligned with U.S. interests. Doing so purportedly required Paramount to have a U.S. nexus, and therefore Mr. Troost needed to transfer ownership of half the shares in Paramount, which owned PDMCC, to Srivastava.

42.    Srivastava repeatedly represented to Mr. Troost during their discussions that he was affiliated with the CIA, and he made a big show of his political connections. Srivastava took Mr. Troost to meet with then-Defense Minister of Indonesia, now-President Prabowo Subianto. Srivastava told Mr. Troost that he had helped remove Mr. Subianto's name from a U.S. no-entry list.

43.    Mr. Troost's colleague, Ibrahima Camara, travelled to Indonesia with Mr. Troost and met with Srivastava. Srivastava continued his CIA charade with Mr. Camara, stating on several occasions that he was with the CIA and tasked with capturing people in Africa wanted by the U.S. Government. Mr. Camara set up a call between Srivastava and the president of an African country during which Mr. Camara acted as a translator. Srivastava told the African president that he was connected with the CIA and could provide security assistance to the country and even arrange a meeting with then-President Biden and a U.S. Senator.

44.    Mr. Troost was understandably beguiled by Srivastava's apparently corroborated affiliation with the CIA, connections, and levels of access. He believed

---

[1] OFAC is the Office of Foreign Assets Control of the U.S. Department of the Treasury that administers and enforces economic and trade sanctions.

Srivastava when he claimed that they would be partnering on a program to trade Russian oil in alignment with Western and U.S. interests. Consequently, Mr. Troost informed the director of his Swiss holding company that he would be selling 50% of his corporate assets to Srivastava for almost nothing because Srivastava was "active CIA" and that Mr. Troost needed Srivastava and the U.S. Government on board in order to stay off the U.S. and its allies' sanctions lists and for his companies to enter the covert program advancing U.S. and Western governments' interests.

45.     Srivastava repeatedly reinforced his supposed CIA bona fides throughout the course of their business relationship.

46.     For example, in September 2022, Mr. Troost accepted Srivastava's invitation to attend the Atlantic Council Global Citizen Awards Gala in New York City. Srivastava seated Mr. Troost next to retired General Wesley Clark, former Supreme Allied Commander of NATO forces and U.S. presidential candidate. General Clark was a business partner of Srivastava's, which impressed Mr. Troost from the time Srivastava first introduced Mr. Troost to him in around June 2022. Srivastava, whose photo appeared in the program along with an ad for the Gaurav and Sharon Srivastava Family Foundation (non-existent at the time) touting its sponsorship of the gala, introduced Mr. Troost to Mary Beth Long, a former CIA operations officer and Assistant Secretary of Defense. Srivastava told Mr. Troost that Ms. Long remained active in the CIA and would vet him. When Ms. Long abruptly left the gala, Srivastava claimed it was because she had to handle a CIA emergency.

47.     While in New York, Srivastava arranged a meeting between Mr. Troost and Ousmane Bamba, a friend of then-President Weah of Liberia. At their meeting, Srivastava offered on behalf of the CIA to rig the upcoming election in President Weah's favor by providing doctored voting machines and by planting drugs and weapons in Weah's adversary's house. He also offered on behalf of the U.S. Government to send election monitors to lend credibility to the rigged results. In exchange, the U.S. Government wanted mineral/oil concessions. Mr. Bamba declined the offer but put Srivastava in touch

with Liberia's Deputy National Security Advisor to whom Srivastava made the same representations and exchanged multiple text messages, calling himself the Chairman of Unity Resources Group, his supposed CIA front company.

48.    Srivastava also impressed Mr. Troost with his access to top-level Democratic politicians. Srivastava arranged for then-Senate Majority Leader Chuck Schumer, Senator Debbie Stabenow, and U.S. Representative Pat Ryan to appear by video at an Atlantic Council food security conference in Indonesia he sponsored in November 2022 that Mr. Troost attended. Representative Ryan thanked Mr. Srivastava during the video.

49.    Months later, at Srivastava's request to promote PDMCC's marketing of Russian oil, senior staff of then-Majority Leader Schumer and Representative Ryan contacted OFAC officials to compel them to contact Paramount's lawyers, an important step in Srivastava maintaining his false pretenses. Srivastava also caused Representative Ryan to write to Janet Yellen, then-U.S. Treasury Secretary, in January 2023 urging OFAC to investigate companies Srivastava perceived as business competitors.

50.    Srivastava claimed that he had access to these officials because he was with the CIA. In truth, as later uncovered, it was because he had donated personally and through his shell company over a million dollars to Democratic party groups and candidates.

### Srivastava Pushes Mr. Troost To Restructure His Companies Under a U.S. Umbrella Under Srivastava's Total Control

51.    When Western countries imposed a price cap on Russian oil in December 2022, Mr. Troost wanted out of the Russian-origin oil business—a sentiment he expressed at the time to others—even though Paramount's business did not violate any laws and was not legally required to stop, as it operated out of the UAE, which did not adopt the price cap. (Ex. 1 at ¶¶ 160-63).

52.    But Srivastava assured Mr. Troost that the U.S. Government and Western allied governments wanted them to continue and restructure their companies under a U.S. parent company controlled by Srivastava with a purported special license from the U.S.

Government. Srivastava claimed to Mr. Troost and others that U.S. officials approved the restructure. He even showed off a picture of himself with President Biden:



53.     Srivastava further claimed that he had spoken with Helene Budliger Artieda, the director of the Swiss State Secretariat for Economic Affairs ("SECO"), its sanctions regulator, who also wanted the company restructured under a U.S. parent company.

54.     To continue maintaining his credibility as a purported CIA operative, Srivastava employed John Maguire, a well-known former CIA station chief, in early 2023.

55.     In or about January 2023, Srivastava arranged a meeting in a private dining room in the Dubai Armani Hotel between himself, Maguire, and the National Security Advisor of a Middle Eastern country that Mr. Troost attended. Maguire is on the left, Srivastava the right:



56.    Srivastava and Maguire told the National Security Advisor that they were there on behalf of the FBI and CIA as part of a program offering U.S. Government assistance to locate and capture terrorists. Maguire pulled a handwritten note out of his pocket containing names of alleged wanted terrorists and passed it to the National Security Advisor. At one point, Srivastava claimed that Maguire would replace then-Secretary of State Anthony Blinken when he resigned.

57.    Not long after the meeting, the National Security Advisor told one of the attendees to stay away from Srivastava and Maguire because they were dangerous.

58.    In the weeks and months that followed, Srivastava attempted to pressure Mr. Troost into signing documents that would have put his companies under Srivastava's total control. Srivastava believed that the companies retained hundreds of millions of undistributed profits, and his ultimate goal was to take that money after the restructuring. Srivastava even had the companies' outside counsel write up legal opinions in early May 2023 concluding that it did not violate U.S. law for Srivastava to receive distributions of profits made through the UAE subsidiary's marketing of Russian oil above the price cap imposed by other countries.

59.    The restructuring process, however, did not move fast enough for Srivastava. There were complicated multi-jurisdictional tax matters to consider, among other issues. And Srivastava was unable to provide written proof of U.S. approval—something Mr. Troost required before putting his businesses under U.S. jurisdiction, which might then legally subject them to the price cap and require an OFAC license going forward (something that was not required otherwise).

60.    But Srivastava kept trying to assure Mr. Troost that the U.S. Government had approved. For example, in a March 2023 text to Mr. Troost, Srivastava claimed that he had met President Biden along with an American oil company executive. Srivastava also assured Mr. Troost that other countries' governments approved, reporting to him supposed conversations with European ambassadors.

61.     Srivastava further told Mr. Troost that if the company did not authorize the restructuring under his control, Srivastava had the U.S. Government's permission to take the program to another company. Doing so, however, would greatly increase the risk of sanctions by governments not aware of the alleged secret partnership with the U.S. Government to market Russian oil over the price cap. (In fact, Srivastava later exploited this risk by advocating for the UK and the EU to sanction Mr. Troost and the companies in 2024; this was ironic since *Srivastava* created that risk by causing PDMCC to continue trading Russian ESPO oil after late 2022.) Srivastava also said that the U.S. Government would be convinced that Mr. Troost was acting on behalf of the Russian Government, a false narrative that Srivastava later, in fact, spread publicly.

62.     In the end, however, Mr. Troost learned that Srivastava had lied about it all. There was no secret program or U.S. Government approval. Srivastava was a grifter, a charlatan pretending to be a CIA operative.

### Srivastava's Scam Falls Apart

63.     Srivastava's scheme began to fall apart in early May 2023 after, among other things, Swiss sanctions regulators at SECO sent a letter to Paramount requesting information about Paramount and PDMCC's activities relating to Russian oil marketing that contradicted Srivastava's earlier claims that Swiss and U.S. authorities had approved continuing in that business.

64.     When Mr. Troost began to realize that Srivastava likely had been lying, he further delayed transferring the business to Srivastava's total control in the U.S. and started asking pointed questions about recently discovered public record of previous fraud cases against Srivastava and whether any of his supposed program had been real.

65.     Srivastava reacted with rage and told Mr. Troost there were "certain things" he could not tell him. According to Srivastava, the public negative information about him was a "false flag," *i.e.*, a deliberately planned ruse.

66.     On May 3, 2023, Srivastava spoke on the phone with Mr. Troost and claimed that the U.S. Government had given Srivastava "carte blanche" for their Russian oil

business and the Swiss sanctioning regulator SECO could "stick it up their ass." Referring to the purported secret U.S. Government program, Srivastava asked Mr. Troost if he could feel "how desperate I am to do this with you."

67.    On May 4, 2023, Srivastava tried to persuade Mr. Troost to finalize restructuring the companies under a U.S. company controlled by Srivastava. Srivastava claimed that the only reason he was able to persuade the U.S. Government that Mr. Troost was not a Russian agent was because one of Mr. Troost's daughters lived in New York. Srivastava also addressed misrepresentations he made in the past about owning a helicopter company, claiming that he does not own it directly because he is a CIA "asset" and that he uses the helicopter company secretly to purchase foreign weapons on behalf of the United States. He said that if he wanted to "buy a fucking plane from North Korea," that company buys it, and when "the Iran drone went down, we buy that equipment" for the U.S. Defense Intelligence Agency.

68.    Srivastava claimed that SECO had expressly told U.S. diplomats in Switzerland that it wanted Paramount to be under a U.S. company, and he warned Mr. Troost that he needed to finalize the restructuring to avoid sanctions and to avoid the U.S. Government believing that Mr. Troost was a Russian agent. Mr. Troost asked Srivastava for written proof of his CIA protection. Srivastava said he could not give any proof before the restructuring but assured Mr. Troost that Mr. Troost was a so-called "MX-1" asset for the U.S. Government. Srivastava said, "It's not like there is a piece of paper that says you are my asset," and sending proof of Mr. Troost's asset status would be "breaching the law."

69.    On May 5, 2023, Srivastava again tried to convince Mr. Troost to finalize the restructuring by reassuring Mr. Troost that he truly was involved with the CIA (which was false) and that the plan had been approved by the U.S. Government (also false). Srivastava also attempted to extort Mr. Troost, threatening that if he did not follow through with the restructuring, "by tomorrow morning, it will be fucking pandemonium in your life." Srivastava told Mr. Troost that "I don't think you understand who you're dealing with,"

but said he could not tell him because of "my clearances and stuff I hold." Srivastava claimed he could call eight senators per day and the President because he was a non-official cover operative ("NOC") with the CIA. To reinforce that Mr. Troost had no choice but to proceed with the restructuring or else Srivastava would ruin him, Srivastava claimed responsibility for cryptocurrency exchange owner Sam Bankman-Fried's prosecution and conviction, saying it was because Mr. Bankman-Fried "fucked with" Srivastava.

70.    On May 6, 2023, Srivastava attempted to extort Mr. Troost by text, accusing him of lying and telling him "most importantly, the inversion has to happen," referring to the restructuring, otherwise Srivastava would tell U.S. authorities that Mr. Troost was a Russian agent and have him sanctioned.

71.    On May 10, 2023, Mr. Troost's holding company expelled Srivastava from the Paramount companies by rescinding their share purchase agreement ("SPA"), on the basis that it "uncovered tangible evidence that [the company] was misled into entering the SPA due to intentional deceit and fundamental error by various parties;" Srivastava had falsely impersonated a CIA operative from the beginning of their relationship and misrepresented the U.S. Government's and allied governments' approval of their Russian oil marketing operations.

72.    Srivastava responded to notice of his expulsion by texting Mr. Troost, "Are you kidding me?" Then, the attacks began.

**Srivastava Attacks Mr. Troost And His Family**

73.    In the days immediately following his expulsion, Srivastava unleashed the "pandemonium" he had previously threatened, including without limitation:

•    Srivastava's personal U.S. lawyer and another lawyer from a prominent U.S. law firm (which until then had been Paramount's lawyers) wrote to the Swiss, UAE, and Turkish ambassadors and requested that their countries freeze the companies' accounts, falsely claiming that Mr. Troost had stolen a major corporate asset;

•    Srivastava and his chief of staff personally met in Washington, D.C. with the Turkish Ambassador to the U.S. and falsely claimed that Mr. Troost was working

for the Russians. Srivastava passed to Turkish officials a typewritten list of allegations against Mr. Troost and his family, including false allegations that Mr. Troost and his family were funding the terrorist Wagner Group (the same terrorist organization to which Srivastava later alleged Mr. Masimore was connected);

- Srivastava's chief of staff, Jim Reese, met at the U.S. Embassy in Switzerland with Special Agent Glen Moffat of the U.S. State Department Diplomatic Security Services to repeat Srivastava's false claims:



- Srivastava's team sent Mr. Troost anonymous WhatsApp messages threatening to inform his wife of purportedly embarrassing personal information;

- Srivastava's team sent Mr. Troost a video file on WhatsApp from an Iranian number that he did not open for security reasons. The sender later deleted it;

- Srivastava's team used that same Iranian number to send journalist Tom Wilson of *The Financial Times* messages offering information about Mr. Troost;

- Srivastava's team used the Iranian number to attempt to extort Mr. Troost for $10 million worth of cryptocurrency, saying, "48 hours to wire USDT 10 million or your un-blurred confession video will go public," and again, two days later, "Looks like we're gonna do this the hard way":



- Mr. Troost's New York-based daughter received a call on her cell phone from an unknown number, which she did not answer. She then received a text, "hi [daughter]. This is Nick from the wall street journal. are you available for a quick call to discuss the article coming out this week on Ganadi [sic] Timchenko, a russian oligarch and the relationship he has with your father, Niels? Hope to hear from you." Approximately two hours later, she received another call from an unknown number that she ignored;[2] and

- Srivastava repeatedly texted Mr. Troost to call him and saying they "need to talk."

---

[2] The attacks on Mr. Troost's New York-based daughter were plainly orchestrated by Srivastava. In late April, Mr. Troost had sent her cell phone number to Srivastava, and Srivastava repeatedly brought her up in calls with Mr. Troost just days before.

74.     Srivastava also instructed Maguire to initiate a negative press and intimidation campaign against Mr. Troost and his family and network that included[3]:

- publication and distribution of an online article accusing Mr. Troost of being "a front for" a sanctioned Russian oligarch and further alleged that Mr. Troost's wife and daughters had committed crimes;

- offering to have Maguire's NYPD "friends" pick up Mr. Troost's New York-based daughter and question her;

- informing Maguire's contacts at the NYPD that Mr. Troost, his family, and others are part of "the web of key people working for Gannady [sic] Timchenko," the same Russian oligarch to whom Srivastava later falsely alleged Mr. Masimore is connected;

- sending Maguire's contacts at the NYPD photographs of Mr. Troost's daughter; and

- planting an article in *Intelligence Online* that falsely claimed Mr. Troost canceled his trip to his daughter's graduation in New York City and alleged that "Troost's US business partner [Srivastava] has provided confidential information about the Dutchman's global business operations, including his potentially illegal deals in Russia, to the FBI, Interpol and law enforcement authorities in Switzerland and the UAE."

### The Press Reports Srivastava's Fraud

75.     A few months later, on October 10, 2023, *Project Brazen* published an article co-authored by Pulitzer Prize-finalist journalist Bradley Hope about Srivastava called "The Old, 'I'm a Secret Spy, Pay Me' Con" that detailed Srivastava's false associations with the CIA. (Ex. 5).

---

[3] (Ex. 6, First Supplemental Affidavit of Jim Reese).

76.     Mr. Hope's team later reported on X that Srivastava and his team made the damaging (but factually accurate) article disappear from Internet searches by issuing a Digital Millenium Copyright Act ("DMCA") notice under the name "Sherrie Hagen."[4]

77.     "Hagen" claimed she wrote the content of the article first on Tumblr and that *Project Brazen* had violated her copyright by plagiarizing it. Through this scheme, Srivastava's team persuaded Google to remove the article from its indexing.[5]

78.     In fact, Hagen's Tumblr post was created in November, after the *Project Brazen* article.

79.     Srivastava's team used the same false copyright scheme to remove other articles critical of him from Google's indexing.

80.     Srivastava's false copyright claims violated U.S. law, because such notices must be given "under the penalty of perjury." See 17 U.S.C. § 512(c)(3)(A)(vi).

**Srivastava And His Team Single Out Mr. Troost's Elder Daughter For Attack**

81.     In December 2023, Srivastava and his team began trying to get Mr. Troost's elder daughter fired from her job at a New York City public relations and marketing agency by repeatedly sending disturbing anonymous emails to her boss, her boss's company contacts, and others, including journalists Tom Wilson and Joe Wallace.

82.     The emails repeated false and disparaging allegations about the Troost family and their New York-based daughter that Srivastava and Maguire had previously disseminated.

83.     The anonymous attacks against Mr. Troost's daughter bore many of Srivastava's hallmarks, including: (1) capitalizing names and random words similar to the document Srivastava had provided to the Turkish diplomats and in Maguire's text messages to his NYPD contacts; (2) alleging facts similar to those Srivastava and Maguire perpetuated in the media; (3) including extra spaces around punctuation marks; (4) ending

---

[4] As discussed herein, Srivastava often used aliases with the surname "Hagen" to conduct illegal activities.

[5] *See* https://x.com/brazenFM/status/1722563409974079877.

one of the emails with "God Bless," a Srivastava catchphrase; (5) including FCPA.fraud@usdoj.gov on copy, to which Srivastava's team had emailed a false report to in June 2023; and (6) sending one anonymous email on the same day and identical in all material respects to a message Srivastava personally sent by WhatsApp to a representative of Indonesian President Subianto's brother.

84.    For example, on December 17, 2023, "ukrainewomen.mother@proton.me" sent an email to Mr. Troost's daughter's boss, copying "FCPA.fraud@usdoj.gov," subject, "URGENT: RUSSIAN OLIGARCH IS [employer's] INVESTOR," stating in part: "It is quite disturbing to know that you have been funded by [NAME] TROOST, the daughter of a wanted fugitive,/criminal . . . . I have reported all of your companies and your network to law enforcement and I would advise you sincerely "selfreport" to appropriate law enforcement agencies on your interactions with [NAME] TROOST. From our research, she([NAME] TROOST) is a trained Russian spy who is trying to infiltrate into America on behalf of her father NIELS TROOST & GENADY TIMCHENKO. . . . I hope you see the light and do the right thing and report [DAUGHTER'S NAME] TROOST to law enforcement. Do the right thing. God Bless." The email also linked to articles about Mr. Troost planted by Srivastava and Maguire.

85.    The same day, "ukrainewomen.mother@proton.me" sent another email to Mr. Troost's daughter's employer, copying, among others, reporters Joe Wallace (*The Wall Street Journal*) and Tom Wilson (*The Financial Times*). The subject line was "RUSSIAN CRIMINAL: DAUGHTER NIELS TROOST – [employer]," and it said, "Attached are pictures of RUSSIAN AGENTS/employees of [DAUGHTER'S NAME] TROOST & RUSSIAN OLIGARCH CRIMINAL DAUGHTER NIELS TROOST, [DAUGHTER'S NAME] TROOST." The remainder of the email contained photographs of the Troost daughter and others pulled from her and others' public social media accounts.

86.    On December 27, 2023, a new email, "ukrainefreedomchild11@proton.me" wrote Mr. Troost's daughter's employer, copying dozens of contacts at the employer and at various art galleries, foundations, and museums with the subject line, "TERRORIST

RUSSIAN AGENT [employer] [DAUGHTER'S NAME] TROOST/NIELS TROOST," stating in part:  "[NAME] TROOST & her family is a trained Russian operative who is tasked to infiltrate the United States through any means. She has done through laundering sanctioned Russian money and stolen money from her father Russian operative Niels Troost." This email, too, contained links to articles about Mr. Troost planted by Srivastava and Maguire and a document Maguire sent to the NYPD in May 2023.

87.    On February 22, 2024, UK authorities sanctioned Mr. Troost for being an "involved person" under UK law because he was "associated with [PDMCC], which is or has been involved in obtaining a benefit or supporting the Government of Russia" and because he "is or has been involved in obtaining a benefit from or supporting the Government of Russia by owning or controlling directly or indirectly [PDMCC]." The designations did not accuse Mr. Troost, Paramount, or PDMCC of illegal actions.

88.    That same day, Srivastava and his team unleashed further attacks on Mr. Troost and his family. Srivastava sent the following messages to a representative of Indonesian President Subianto's brother, cutting and pasting the UK designation announcement (including its capitalization of names), and attaching a particular *Financial Times* article, "UK Sanctions Dutch Oil Trader Over Russia Links":



89.    Also that day, Srivastava's team, using the email address "Ukraine.freedom112233@proton.me" emailed Mr. Troost's daughter's employer in New York, with the subject line, "US/UK SANCTION : [DAUGHTER'S NAME] NIELS TROOST," stating in part: "How can your company pretend to care about women and children when you supporting Russian criminal financier NIELS OSCAR TROOST and his daughter [NAME] TROOST." The email attached the same *Financial Times* article and cut and pasted the same portion of the sanction designation announcement that Srivastava had messaged to President Subianto's brother's representative:

> **Unique ID: RUS2086 - Individual**
>
> **Regime Name:** The Russia (Sanctions) (EU Exit) Regulations 2019 **Sanctions Imposed:** Asset freeze | Travel Ban | Trust Services Sanctions **UK Statement of Reasons:** Niels Oscar TROOST is an involved person under the Russia (Sanctions) (EU Exit) Regulations 2019 based on the following grounds: (i) Niels Oscar TROOST is associated with PARAMOUNT ENERGY & COMMODITIES SA, which is or has been involved in obtaining a benefit from or supporting the Government of Russia and (ii) Niels Oscar TROOST is or has been involved in obtaining a benefit from or supporting the Government of Russia by owning or controlling directly or indirectly PARAMOUNT ENERGY & COMMODITIES DMCC.
>
> **DOBs:** ████ 1969
> **Nationalities:** Netherlands
> **Genders:** Male
>
> **Name:** Niels Oscar TROOST **Name Type:** Primary Name
>
> **Address:** 44A ROUTE DE SOUS-MOULIN THONEX **Address Postal Code:** 1226 **Address Country:** Switzerland
> **Designation Source:** UK **Date Designated:** 22/02/2024 **OFSI Group ID:** 16413

## **Srivastava Sends Orrick To Attack Mr. Troost And Mr. Masimore**

90.    On the heels of Srivastava's attack on Mr. Troost's daughter, Srivastava dispatched his lawyers at Orrick to press a false counternarrative that he was the victim of a disinformation campaign run by Mr. Masimore.

91.    By letter to Mr. Masimore on February 27, 2024, Mark Beeley of Orrick accused Mr. Troost and Mr. Masimore of defaming Srivastava and claimed that "the allegation that Srivastava ever held himself out to be a 'non-official cover' ('NOC') operative of the CIA is denied in its entirety, and there is no evidence Srivastava connected himself to the U.S. government in the way [you] describe. Indeed, it would have endangered Srivastava personally and professionally to have done so." Orrick was referring to a letter Mr. Masimore had written to Srivastava's former lawyers on May 25, 2023, describing specific evidence of his frauds, including transcripts of Srivastava and others' phone calls to Mr. Troost in which they claimed Srivastava was a CIA operative. Those lawyers stopped representing Mr. Srivastava shortly after receiving that letter.

92.    On March 5, 2024, Mr. Masimore responded to Orrick on behalf of Mr. Troost that Srivastava's complaints were baseless because "the information contained in our 25 May 2023 letter to [Srivastava's then-lawyers] is supported by evidence in all material respects. Since then we have collected substantially more evidence from various sources in several jurisdictions further corroborating [Mr. Troost's] version of the events, including documentary evidence and information from multiple witnesses. On the other hand, your accusations, apparently parroting Srivastava's position without the benefit of our client's evidence, are absurd and, in many cases, demonstrably false." Mr. Masimore also noted that Srivastava's denial of responsibility for extorting Mr. Troost and attacking him and his family in the immediate aftermath of his expulsion required believing it is "mere coincidence that precisely when Mr. Troost [via his lawyers] began to fight back against Srivastava's scheme in mid-May someone else—unrelated to Srivastava, but who (like him) had access to the personal cell phone numbers of Mr. Troost and his family members—began extorting Mr. Troost." Srivastava's story required "believing that Mr. Troost deceived multiple former U.S. Department of Justice prosecutors with extensive experience successfully prosecuting criminal fraud schemes, international money laundering, and organized crime, each of whom then adopted on blind faith 'post-hoc inventions' without any evidence or corroboration."

93.    Mr. Masimore also provided additional excerpts of documentary evidence refuting Srivastava. Mr. Masimore explained that the laundered $25 million fraudulently looted from PDMCC out of a sham loan of $51 million engineered by Srivastava to President Subianto's brother's company had been confirmed "by information from first-hand witnesses, including emails, text messages, wire transfers and related documents laying out the entire series of events," and sent Beeley screenshots of Srivastava's February 2024 text messages to a representative of President Subianto's brother substantially identical to an anonymous email sent to Mr. Troost's daughter's employer. Mr. Masimore demanded that Srivastava stop harassing her.

94.    When Orrick received Mr. Masimore's letter, Srivastava contacted the representative of President Subianto's brother, "We have received screen shots of conversations [the general counsel] has purportedly provided , would like to know if those screenshots are real and are indeed provided by [the general counsel], seems absurd . Second, best to wait till we meet in person to discuss the alleged discrepancies. The sanctioned entity legal counsel has provided all screenshots of [the general counsel's] conversations. Quite confused frankly."

95.    Meanwhile, Orrick was helping Srivastava push out false information about Mr. Troost to journalists.

96.    Adams, referring to himself as "Ambassador (ret.)" to leverage his status and credibility, communicated with journalists in mid-March 2024 on Srivastava's behalf offering to share "disproof," calling the substantively accurate Bradley Hope article in *Project Brazen* "a tissue of outright fabrications." Adams referred to Mr. Troost's account as "toxic trash," called Mr. Troost a "criminally-sanctioned crook," and accused Srivastava's former lobbyist, Ankit Desai, of speaking "nonsense" that was "made up" by him. As demonstrated by the evidence filed in *Troost v. Arkin*, the only "nonsense" and "toxic trash" being disseminated was by Orrick and Srivastava.

97.    On May 13, 2024, Beeley responded to Mr. Masimore and denied Srivastava's involvement in attacking Mr. Troost's daughter. Worse, he blamed it on her father, writing, "it is Mr Troost—with the assistance of [Mr. Masimore]—who has improperly escalated this matter to involve a defamatory media campaign." Beeley also "denied that Mr Srivastava benefitted personally from Paramount DMCC funds and further the apparent transaction between Paramount DMCC and [the Indonesian company through which Srivastava's lawyer laundered the stolen money] is irrelevant on its face."

98.    Orrick's denial was nonsense. On January 22, 2024, Mr. Masimore had sent Srivastava's California family lawyer a letter documenting all of the transactions and attaching 56 exhibits documenting Srivastava's money laundering. (Ex. 7). But Orrick conducted no fact-finding, and Srivastava apparently did not realize that President

Subianto's brother's company had disclosed to Mr. Troost's counsel substantial evidence, including a smoking-gun document (a draft personal guarantee), that Srivastava's California family lawyer had emailed to them in June 2023 confirming that Srivastava and his wife had taken $25 million of PDMCC's money and were trying to take the rest:



> **INDIVIDUAL GUARANTEE**
>
> 1. <u>Parties</u>.
>
>    This Guarantee is entered into as of the 1st day of July, 2023, by and between Arsari Capital _____, an Indonesian company ("Borrower"), and Gaurav and Sharon Srivastava, individually (collectively, "Guarantor"), with reference to the following facts:
>
> 2. <u>Recitals</u>.
>
>    2.1  Borrower has previously borrowed the amount of USD $51 million for the benefit of Guarantor (the "Funds"), which funds have been held by Borrower to be distributed to Guarantor at Guarantor's direction.
>
>    2.2  Borrower has sent the amount of USD $25 million from the Funds to Guarantor on or about January 5, 2023 leaving a balance of the Funds of $26 million.

### Srivastava Continues to Attack the Troost Family Via Fraudulent Online Articles

99.    In or around mid-June 2024, Srivastava began populating the Internet with false and negative stories about Mr. Troost written by phony authors with fake profiles, with the intent of creating public pressure on authorities to sanction Mr. Troost.

100.    Mr. Masimore, through Brodbecks Law, successfully convinced several publishers to remove these bogus articles.

101.    For example, on June 11, 2024, Eurasiareview.com published "Remaining Vigilant and Committed to Combatting the Spread of Disinformation—OpEd," by "Amanda Baumann." It claimed, among other things, that Mr. Troost "clandestinely fund[s] the Wagner mercenary group," a terror organization. And it contained links to other negative articles about Mr. Troost generated by Srivastava's team.

102.    Everything about the article was fake, including its author. According to her bio, "Amanda Baumann read her MA in behavioural science in Zurich, when she returned

to her native Switzerland after 15 years of living and working in London. She is now an analyst based in Switzerland." However, no school in Zurich offers that curriculum; there is no record of "Amanda Baumann" based in Switzerland or who previously lived in London; and there are no other publicly available articles attributed to her.

103.    Eurasia Review removed the article and apologized to Mr. Troost. It also revealed that "the alleged author Amanda Baumann sent directly her article to our submission email address, along with her bio. The email that she used was a.amanda.7969@gmail.com. Going back through our deleted messages, it appears that she might also have sent other emails using aamanda_19_88@protonmail.com."

104.    Also on June 11, 2024, International Policy Digest published "The Age of Sanctions Busting Impunity Must Come to An End," supposedly by "Bernardo Almeida." It alleged that "What sets Troost apart . . . is Troost's direct relations with the Kremlin"; "Troost's sanctions-busting business actions underwrit[e]" a terrorist "enterprise, ostensibly in exchange for access to discounted Russian oil, and as part of a larger scale coordinated plan to promote Russian interests"; and "reports are circulating that sanctioning [of Mr. Troost by the U.S.] is imminent after previously undisclosed U.S. business interest were leaked to the FBI."

105.    This author, too, was fake. His bio claimed, "Bernardo Almeida is a freelance analyst based in Rio de Janeiro, focused on Russian grand strategy in Latin America. He has an MA in Conflict Studies from the University of São Paulo." But that university does not offer a master's curriculum in "Conflict Studies," there was no online record of any "Bernardo Almeida" then based in Rio de Janeiro who matched the photo accompanying the article, and there are no other publicly available articles attributed to "Bernardo Almeida" outside International Policy Digest.

106.    International Policy Digest removed the article.

107.    In another example, on June 19, 2024, EU Reporter published "Europe Can Learn a Valuable Lesson From the UK's Comprehensive Sanctions Regime," purportedly by "Lisa Hagen."  On June 19, 2024, "Lisa Hagen" at lisahagen590@gmail.com emailed

the EU Reporter attaching the article and writing, "Good morning Editor, My name is Lisa and I would like to submit the attached letter for consideration by EU Reporter. I am a grad student focused on European Public Affairs and have been following the question of European and UK sanctions regimes quite closely. I do hope you find this interesting." The article claimed Mr. Troost had an "intimate business relationship with Putin's close associate Gennady Timchenko, who has used his own energy empire, and perhaps that of Troost, to fund what is slowly proving to be the new Wagner mercenary force, Redut."

108.   "Lisa Hagen" was also fake. Her bio claimed that she "is a Netherlands-based graduate student specializing in European Studies with an emphasis on European Public Affairs and Environmental Policy. She is particularly interested in the governance of natural resources." Here again, there is no historical online record of any Netherlands-based "Lisa Hagen," nor is there any record of any "Lisa Hagen" engaged in graduate-level European Studies in the Netherlands, and there are no other publicly available articles attributed to her.

109.   After the EU Reporter removed the article, "Lisa Hagen" wrote to the editors, "My article does not seem to be live anymore? Any idea why?" The publisher forwarded to "Lisa Hagen" a letter Mr. Masimore had sent to the EU Report from Brodbecks Law about the phony attribution, and the publisher asked her to provide a copy of her passport "to prove that Lisa Hagen is a real person" and to "provide proof of the assertions and accusations that you make within the article concerning Mr Niels Troost and Mr Robin Luisier." The person pretending to be "Lisa Hagen" replied that Lisa Hagen was not their name but insisted that the EU should "sanction him [Mr. Troost] and his cronies."

**Srivastava Attacks The Troost Family Via Fraudulent Websites**

110.   After disseminating the foregoing false and defamatory articles by fake authors about Mr. Troost, Srivastava opened a new front against Mr. Troost, his family, and, ultimately, Mr. Masimore via false and defamatory websites.

111.   According to Namecheap records obtained in response to a subpoena,[6] on June 19, 2024, "Elison Turtch," at email address "elison.turtch@proton.me," with a physical address and phone number for the Citystudios Hotel in Zurich, used cryptocurrency to pay Namecheap to register the domain "sanctionnielstroost.com," which was used to disseminate false and defamatory information about Mr. Troost, his family, and Mr. Masimore.

112.   That same day, "Victor Lungu" at email address "jesseplemons512@proton.me," which was later changed to "Maria Verde" at email address "maria.verde23@proton.me," with a physical address and phone number for the Bastion Hotel in Leiden, Netherlands, used cryptocurrency to pay Namecheap to register the domain "srivastavagaurav.com," which was used to disseminate positive information about Srivastava and his foundation.

113.   The positive Srivastava site featured a photo of him shaking hands with then-President of Indonesia Joko Widodo. It called Srivastava "an oil industry veteran and renowned philanthropist," and labeled him a "Petrodollar Warrior," saying "Gaurav Srivastava recognizes that the foundation of energy security relies on the petrodollar." The bottom of its home page read, "©2024 Gaurav Srivastava":

---

[6] After Srivastava's lawyer at Orrick denied Srivastava's involvement in the Defamatory Sites, Brodbecks Law filed a defamation action in N.Y. State Supreme Court against John Doe 1 and 2 and subpoenaed Namecheap for information about the Defamatory Sites.



114.   In addition to registering the defamatory and the positive sites *on the same day*, paying for both with cryptocurrency, and listing addresses and telephone numbers for European hotels for both, the correspondence between each account holder and Namecheap bears idiosyncratic similarities. For example, both account holders started multiple messages with Namecheap's customer service personnel, "hi there." Both used a backwards apostrophe in contractions. And the IP addresses accessing both users' accounts at Namecheap were from VPN services.

115.   The content posted periodically on the sanctionnielstroost.com website parroted much of the negative information against Mr. Troost and his family that

Srivastava and others, including his lawyers at Orrick, pushed out to the reputable journalists then investigating Srivastava.

### After Brodbecks Law Asserts Mr. Troost's Legal Rights, Srivastava Attacks Mr. Masimore Online

116.  On July 12, 2024, Mr. Masimore (on Brodbecks Law letterhead) filed a DMCA notice with Namecheap against sanctionnielstroost.com regarding a photograph of Mr. Troost it displayed, which Mr. Troost had taken and for which he owned the copyright. Namecheap temporarily deactivated the site.

117.  On August 10, 2024, "Elison Turtch" wrote to Namecheap, stating, "Unfortunately, I didn `t [sic] get a chance to react to your warning email due to the fact that I have been to the hospital and didn `t [sic] have an opportunity to check my email. I would like to restore the issue and resolve it. I had no attempt to violate Namecheap `s legal rules and I am willing to do everything to fix this misunderstanding." The following day, "Elison Turtch" wrote, "I would like to update you that I uploaded new photos to my website that do not violate any copyright norms. It should be noted that the previous photos were heavily edited and therefore, were the products of my work. However, I know for sure that it would be impossible to negotiate this issue with a person who complained."

118.  Namecheap then restored sanctionnielstroost.com.

119.  On or about August 13, 2024, Srivastava added a page to the restored sanctionnielstroost.com website entitled "Jason Masimore: The Advocate Behind Niels Troost." The posting included an image of the bottom half of the last page of Brodbecks Law's DMCA notice, including Mr. Masimore's signature, and called it "A letter that Jason Masimore sent to us in order to silence the truth about Niels Troost." This was inaccurate—Mr. Masimore sent the letter to Namecheap, not "Elison Turtch," and it validly asserted Mr. Troost's copyright in his own photograph.

120.  The defamatory post continued: "In the shadowy world of corruption and money laundering, Niels Troost works tirelessly to cover up his dirty business that includes corruption, money laundering, violations of international law and other illegal

activities. But behind every criminal stands a 'devil's advocate' who ensures that the crimes remain in the shadows from the scrutinizing eye of justice and truth. In case of Niels Troost, this person is none other than Jason A. Masimore." It continued, "His expertise to navigate legal systems and connections in many spheres makes him a perfect protector of international criminals. Niels Troost, a name that has become synonymous with the illegal trade of Russian oil, has found Masimore to be the perfect partner to ensure his business with Putin and his associates continues uninterrupted."

121.   This is false on multiple grounds, not the least of which is that Mr. Masimore does not advise clients, including Mr. Troost, on business transactions.

122.   The defamatory post further alleged, "Masimore does not only have legal skills but also is willing to silence those who dare reveal the truth about his clients. Journalists and media organizations who have exposed Niels Troost in their articles and investigative reports, know Jason `s [sic] name very well. Whenever there is a new article about Niels Troost and his illegal activities, Jason comes out and sends threatening letters to the news outlets requiring to take any materials mentioning Troost down. . . . Jason Masimore's work is a testament to the dark side of the legal profession, where knowledge is not used to seek justice, but to protect the rich and powerful from the consequences of their actions. What is important to understand here is the real role Mr. Masimore plays in the global corruption scenario. He is not just a lawyer; he also commits crimes, protecting his clients and attacking their 'enemies.'"

123.   These allegations are false and defamatory *per se*, as Mr. Masimore does not commit crimes.

124.   Srivastava also added a photo of Mr. Masimore to the home page of sanctionnielstroost.com, falsely depicting him as being directly connected to Vladimir Putin, the sanctioned oligarch Gennady Timchenko, and the terrorist Wagner Group, with the caption, "Niels Troost And His Associates Who Assist Him In His Shady Deals":



125.    In fact, Mr. Masimore has no connections of any kind to Vladimir Putin, Gennady Timchenko, or the Wagner Group. Mr. Masimore does not offer legal advice on corporate transactions, much less "shady" ones, and he was first retained after Srivastava's frauds against Mr. Troost were being uncovered.

126.    The photograph of Mr. Masimore was from the Kobre & Kim website but manipulated (poorly) to make him appear to be wearing a tuxedo. Mr. Masimore does not and has not assisted Mr. Troost with any "deals."

127.    In coordination with the timing of Srivastava's online attack, Srivastava's UK lawyer, Mark Beeley of Orrick, wrote to Mr. Masimore's former law firm, Kobre & Kim, on August 15, 2024, "We note that it appears in the immediate days following [prior] correspondence, Mr. Masimore left the partnership of any Kobre & Kim entity. We also understand that Mr. Masimore has since opened a new firm where he continues to act for Mr. Niels Troost" in relation to Srivastava. Orrick asked for "confirmation, with respect to this matter, of whether . . . Kobre & Kim (including the UK and US entities) stand by Mr. Masimore's conduct in respect of our client [Srivastava] while he was a partner of the Kobre & Kim law firm."

128.    The purported "conduct" Beeley referenced was this: Beeley had repeatedly accused Mr. Masimore, without any basis, of breaching ethical standards, including in his February 27, 2024, letter to Mr. Masimore. (*See supra* at para. 91).

129.    Mr. Masimore, who had investigated and prosecuted numerous complicated international wire fraud and money laundering cases when he was an Assistant United States Attorney in the Southern District of New York, knew for a fact what Srivastava had done. Mr. Masimore had heard recorded conversations between Mr. Troost and Srivastava in which Srivastava falsely claimed to work for the CIA, in violation of 18 U.S.C. § 1343, among other criminal statutes. (Those recordings have been authenticated by an audio forensics expert formerly with the FBI, *see* Ex. 1 at ¶ 300 n.165). Mr. Masimore had reviewed detailed contemporaneous text messages and international financial transaction information showing that Srivastava had fraudulently taken $25 million and used his California lawyer to launder it through a Delaware shell company into a Pacific Palisades estate, in violation of 18 U.S.C. §§ 1956 and 1957. And Mr. Masimore was aware of witnesses willing to testify under oath that they had been present and observed Srivastava claim affiliation with the CIA. Evidence of these acts were filed as exhibits to *Troost v. Arkin*.

130.    Kobre & Kim stood by Mr. Masimore's "conduct," which was courageous lawyering against a dangerous adversary willing to attack Mr. Masimore personally and professionally and say anything without regard for the truth to get away with his criminal schemes. On September 11, 2024, Kobre & Kim responded to Orrick and rejected any allegations that Mr. Masimore had been fired, stating that his departure was amicable. "Mr Masimore left K&K to pursue other opportunities. His leaving had nothing whatsoever to do with his conduct while at the firm and . . . it would be completely wrong to claim otherwise or infer from his departure any concerns on behalf of the firm."

131.    Around this same time, in or about August 2024, Srivastava (with Beeley and Adams by his side) presented false information about Mr. Masimore to reporters Joe Wallace of *The Wall Street Journal* and Tom Wilson of *The Financial Times*, who were

then working on stories critical of Srivastava. Among other falsehoods, Srivastava and his team gave the reporters Orrick's letters to Mr. Masimore falsely accusing him of ethical breaches (for reporting factually true information) and told the reporters that Kobre & Kim had fired Mr. Masimore for cause and committing legal malpractice in his representation of Mr. Troost. Such allegations are false and defamatory. Mr. Masimore left amicably and enjoys a fine personal and professional relationship with Kobre & Kim and its lawyers. Kobre & Kim have referred matters to Brodbecks Law since Mr. Masimore's departure and vice versa. Mr. Masimore had dinner with one of Kobre & Kim's founders and nine other Kobre & Kim partners in New York City on July 9, 2025.

## Mr. Masimore Informs Srivastava's Attorneys That Srivastava's Fingerprints Are All Over The Defamatory Sites

132.    On or about August 23, 2024, Mr. Masimore wrote to Orrick on behalf of himself and Brodbecks Law regarding Srivastava's defamatory smear campaign against him. Mr. Masimore cited "several key mistakes [Srivastava made] in trying to conceal his involvement in producing this defamatory site."

133.    Among other things, the original graphic maligning Mr. Troost contained a photo supposedly of Francois Mauron (PDMCC's director), which was misspelled "Francaise Marron." But the photo was actually from the passport of Ibrahima Camara and had been obtained by Srivastava on January 26, 2023, via an email from Paramount personnel to Srivastava's then-lawyer. Because the photo of Mr. Camara came from his passport, Srivastava's agent who created the website confused Francois Mauron with Mr.

Camara's nationality ("Francaise," French) and eye color ("Marron," brown) listed on the passport. This was the original graphic:

134.  Srivastava's team later fixed the mistake and switched out Mr. Camara's photo for one of Francois Mauron and corrected the label. The new graphic also added Robin Luisier's photo (the director of Mr. Troost's holding company).

135.  Srivastava's team used the same head shots from government-issued identification documents of Mr. Luisier and Mr. Mauron that he previously attached to a mid-May 2023 letter his lawyer sent to a Swiss Ambassador.

136.  In addition, Srivastava's team replaced Mr. Troost's copyrighted selfie with a headshot from his Swiss residence permit, which Mr. Troost had sent to Srivastava early in their relationship.

137.  A page on the site also featured a photo of Mr. and Mrs. Troost that only the Troost and Srivastava families would have had:



COMPLAINT

138.   The image was a cropped and reversed version of a photo of the Troost and Srivastava families in front of the Four Seasons hotel in New York City on September 20, 2022, taken at the same time as this one:



139.   The sanctionnielstroost.com site further alleged that Mr. Troost had "unsavory connections to the Wagner Group and Russian intelligence," and that he was "supplying money to Wagner mercenaries in addition to making money from illegal Russian oil transactions," among other things. It also attacked his wife, saying she "acted as a front for a number of companies and bank accounts, [which] highlights the complex and frequently concealed networks that circumvent regulatory actions," that she "gave [Paramount's] illegal operations a veneer of legitimacy by posing as companies and bank accounts," and that she "had a role in undermining international efforts to maintain peace and security."

140.   The site also attacked the Troosts' New York-based daughter, raising "questions about her involvement in his business dealings" and that she "might also be complicit in his controversial activities." The site targeted her employment, saying "As the public becomes more aware of [the daughter's] family connections, it's unlikely that anyone would want to engage in business relationships with her . . . She relishes the spotlight, even as she carefully ensures that the public remains in the dark about her family."

141.   Not coincidentally, Srivastava had brought up this daughter in conversations with Mr. Troost in May 2023, and had already attacked her reputation by targeting her employer with anonymous defamatory emails trying to get her fired in December 2023.

142.   On August 27, 2024, Mr. Masimore wrote to Orrick on behalf of Mr. Troost and his family to complain "about the false and defamatory statements your client, Gaurav Srivastava, apparently caused to be published about them" on the sanctionnielstroost.com website. Mr. Masimore wrote that Srivastava's targeting of Mr. Troost's daughter was "deplorable," and "[t]his marks the second time I have asked you to stop your client from targeting [her] . . . Your client's actions are cruel and malicious."

143.   The next day, on August 28, 2024, the front page of *The Wall Street Journal* featured an article by Joe Wallace, "A Fake Spy, Russian Oil and $1 Million Funneled to Democrats, Former business partner claims Gaurav Srivastava scammed millions by posing as a CIA operative; a photo op with Biden." (Ex. 3). The 3,800-word article detailed Srivastava's fraud and extortion against Mr. Troost, citing interviews and sworn witness statements, documents, and recordings of Srivastava claiming to work for the CIA. The article reported, "On the face of it, Srivastava's pitch wasn't entirely far-fetched. Profiting from the overlap between commodities, intelligence and security is an old line of business, especially in developing economies and war zones. Srivastava told associates he would compete with Erik Prince, the former chief executive of defense contractor Blackwater, who later went into oil, minerals and logistics." It also reported that Srivastava told people he worked with the CIA long before he met Mr. Troost.

144.   According to the article, Srivastava's lawyers at Orrick had ample opportunity to present materials corroborating Srivastava's account to Mr. Wallace before publication. The article stated that Srivastava's attorney Charles Adams had shared the letters that Orrick had written to Mr. Masimore and "described the Journal's questions as 'bulls[hit]' without elaborating. 'We won't acknowledge your existence,' Adams said."

145.   Ultimately, however, neither Mr. Wallace, nor *The Wall Street Journal*'s editorial or legal staff believed Srivastava's and Orrick's unsupported account when compared to the actual evidence.

146.   On August 28, 2024, Beeley of Orrick responded to Mr. Masimore's letter complaining of defamatory statements on sanctionnielstroost.com that Mr. Masimore committed crimes on behalf of the Russian war machine. Orrick denied that Srivastava was connected to the sanctionnielstroost.com website; denied that the statements accusing Mr. Masimore of committing crimes were defamatory; and characterized the evidence linking Srivastava to the sites as "the product of speculation." Rather than consider the evidence seriously, Beeley blamed Mr. Masimore, stating, "you now seem to complain of the media storm which you have created."

147.   Mr. Masimore replied the next day, citing legal precedent defining defamation *per se* against an attorney. Mr. Masimore also criticized Beeley for mischaracterizing Mr. Masimore's argument about why the evidence pointed to Srivastava as the likely source of the defamatory material. Mr. Masimore wrote, "My impression of the situation is that Srivastava's UK- and Switzerland-based team of excellent international arbitration specialists are not used to representing a U.S.-based client like [Srivastava] who apparently outright lies to them and who is alleged to have been implicated in what amounts to a series of serious potential U.S. crimes. According to *The Wall Street Journal*, even sophisticated operators like General Wesley Clark and seasoned D.C. politicians fell for apparent misrepresentations by Srivastava." Mr. Masimore suggested that Adams and Beeley, international arbitration lawyers out of their professional depth with Srivastava, should consult a white collar criminal defense specialist at their firm who "will understand the significance of the evidence against Srivastava set out in various correspondence and elsewhere and can help sort out what is real and what is not so that Orrick does not advance unsupportable and embarrassing positions on behalf of its client in correspondence with lawyers and in statements to the press."

**Srivastava Creates And Publishes The Fake Masimore Professional Site**

148.   After publication of *The Wall Street Journal* piece, Srivastava realized that independent investigative journalists at internationally renowned media outlets believed the evidence supporting Mr. Troost's account of Srivastava's fake CIA scam collected by Mr. Masimore and did not believe Srivastava's false counternarrative curated by Orrick. He therefore decided to escalate his attacks on Mr. Masimore.

149.   Srivastava began by creating a website in Mr. Masimore's name, jasonmasimore.com, that would appear in Google searches for Mr. Masimore, rather than the site for Brodbecks Law. Srivastava made sure that anyone looking for Mr. Masimore would read his false and defamatory allegations about Mr. Masimore first.

150.   Records subpoenaed from Namecheap show that on September 11, 2024, "Elison Turtch" (the same alias used to register sanctionnielstroost.com) used cryptocurrency to pay to register the domains jasonmasimore.com; jasonmasimore.org; and jasonmasimore.net.

151.   "Elison Turtch" published the website and made it appear, on first impression, to be Mr. Masimore's professional website, caused it to feature prominently in Google searches for Mr. Masimore, and linked it to the defamatory page on sanctionnielstroost.com.

152.   The first image on jasonmasimore.net was of hands in handcuffs reaching toward a headshot of Mr. Masimore taken from the former Kobre & Kim website but reversed and pasted onto a suit and tie:



Jason A. Masimore

153.   The site featured large-font headings, including "Jason Masimore – The Protector of Corruption"; "An Enabler of International Crime"; "A Threat to Truth and Transparency"; "The Legal Boundaries and Ethical Violations of Jason Masimore"; and "The Dark Side of Jason Masimore's Legal Expertise." Toward the end it contained a link to a form "Contact us for more information about Jason Masimore." At the bottom in small font it read, "Disclaimer: This website is not officially associated with or owned by Jason Masimore. It does not represent Jason Masimore or his official activities." But it also falsely purported that Mr. Masimore held the copyright in the content of the site: "©2024 Jason Masimore."

154.   The site alleged, "Jason Masimore's client Niels Troost, known for his involvement in the illegal Russian oil trade, sees Masimore as a crucial partner. Masimore, with his legal expertise and strategic moves tries to protect Troost's relationships with Gennadiy [sic] Timchenko and other prominent Kremlin-linked individuals. . . . Masimore tries to enable international crime from the legal point of view. . . . Masimore's function in these areas extends beyond just providing legal services; it includes actively assisting his clients take advantage of these complex systems. Jason Masimore's expert guidance

on maneuvering through the complex realm of international law allows his clients to carry out their illegal actions without worrying about facing repercussions."

155.    The foregoing allegations are false, not the least because Mr. Masimore does not provide transactional advice nor enable international crime.

156.    The site also alleged that "Jason Masimore's efforts to protect his clients also cover the area of media and public examination. His aggressive strategies towards reporters and media outlets who reveal his clients' crimes highlight a disturbing aspect of his practice. By leveraging his legal expertise to challenge and silence those who bring the truth to light, Masimore not only tries to shield his clients but also undermines the principles of transparency and accountability."

157.    These allegations are false. Mr. Masimore contacted sites that published false allegations that Mr. Troost funded terrorism by fake authors with phony profiles in violation of basic journalistic norms.

158.    The site also falsely accused Mr. Masimore of violating UK laws: "According to the law, lawyers in the UK are not allowed to offer legal services to people who are under financial sanctions. . . . By representing sanctioned clients, Masimore not only violates laws but also undermines the legal system's integrity."

159.    These allegations are false on multiple grounds. First, in the UK, lawyers are, in fact, permitted to provide legal representation to sanctioned people and entities— sanctions are a political, not criminal, tool. This is a major area of practice for many respected UK-based firms, who even advertise these services on their websites. In fact, *Chambers*, a leading professional guide recognizing accomplished attorneys in various fields dedicates an entire section to recognizing top UK-qualified lawyers who represent sanctioned persons. *See https://chambers.com/legal-rankings/sanctions-uk-wide-1:2709:11805:1?l=en-GB*. Second, Mr. Masimore is an American citizen, licensed to practice law in New York, who provides legal services through Brodbecks Law, a New York-registered professional limited liability company. He is not licensed to practice law

in the UK and he is not a UK citizen. Neither Mr. Masimore nor Brodbecks Law holds itself out as maintaining professional offices in the UK.

160.   The site alleged, "Masimore's activities serve as a strong reminder that legal representation isn't always driven by the pursuit of justice; instead, it can be used to shield the corrupt and uphold injustice. In the complex and often shadowy realm of the global criminal world, Jason Masimore is a prominent figure indeed—a lawyer whose efforts and strategies work not to support but to weaken the law. . . paint[ing] a troubling picture of a lawyer prioritizing making more money than with upholding the principles of justice and transparency."

161.   These statements are false. Mr. Masimore has been engaged by Mr. Troost to zealously advocate on his behalf and to battle Srivastava's numerous acts of fraud, his malicious attacks on Mr. Troost and his family, and his endangerment of international security interests by posing as a CIA operative before world leaders.

162.   When Mr. Masimore learned of the jasonmasimore.com site on September 27, 2024, he sent a short and informal lawyer-to-lawyer email to Beeley, Srivastava's counsel at Orrick, that simply read: "Mate. Really?" and linked to the site.

163.   Nine hours later (overnight on a weekend), and without performing due diligence other than presumably asking his client, Beeley responded by copying unknown others via a distribution list called "Cedar@Orrick.com": "Dear Mr. Masimore, If by your email below you are enquiring as to whether our client is responsible for the website you identified, I have taken instruction and our client is not the owner or controller of the site, and is not responsible for the content."

164.   Mr. Masimore responded on September 30, 2024, "I wasn't enquiring—I know he is. And so do you. That is why you've started merely passing through your client's denials wrapped in language like 'I have taken instruction' (your email), and 'Mr Srivastava denies that' (August 28), and 'our client denies that' (September 13). . . . I understand that [the UK solicitor ethics body] Regs 1.4 and 1.5 require more from you and your firm."

165.   Beeley did not respond, and the Defamatory Sites remained active for months.

166.   Meanwhile, Mr. Masimore received embarrassing reports from potential business referral sources who had seen the jasonmasimore.com site and expressed concern for him, his reputation, and his career.

<u>**Srivastava Continues To Attack The Troosts**</u>

167.   After the summer of pushing out negative articles about Mr. Troost and defaming Mr. Masimore to journalists and on the Defamatory Sites, Srivastava and his team redoubled their efforts against Mr. Troost's son and wife.

168.   On September 10, 2024, "emma.kleinish@gmail.com" contacted Mr. Troost's son's university, stating "My name is Emma Klein and I am a freelance journalist currently working on an investigative article related to sanctions evasion in Europe. During my research, I discovered that one of your students, [first name misspelled] Troost, is the son of Niels Troost. . . The connections and activities of Niels Troost, including his use of offshore accounts and partnerships with well known sanctioned entities, raise serious ethical questions about the origins of the funding supporting [first name misspelled] Troost's education."

169.   Like other purported "journalists" employed by Srivastava's team, "Emma Klein" is not really a freelance journalist, and that name is an alias.

170.   On September 22, 2024, "Emma Klein" contacted the university again, trying to convince it to expel Mr. Troost's son.

171.   On October 23, 2024, "Lisa Hagen" at lisa.hagenn@gmail.com contacted the university and asked about Mr. Troost's son—misspelling his first name in the same way as "Emma Klein" and as it appeared on the sanctionneilstroost.com website.

172.   *The Financial Times* reported that Mr. Troost's son was asked to leave his university.

173.   On September 5, 2024, "Julia" at "Juliamarketing5@gmail.com" emailed "Anna" at "ann.netpeaklinkbuilder@gmail.com" offering to pay $30,000 to publish an

article about Mrs. Troost on 30 websites. It included a link to an already-drafted article entitled "[Mrs. Troost's name]– a Modern Russian Stacking Doll." It said that people "have long used complex legal and financial structures to shield their assets from sanctions . . . often referred to as 'Russian stacking dolls'," and it accused Mrs. Troost of being a "Russian stacking doll," that she "played a key role in enabling deals that are beneficial to Russian business interest, specifically those associated with Gennady Timchenko, a prominent Russian oligarch and supporter of President Vladimir Putin," that Mr. Timchenko "has connections to a variety of business ventures that [Mrs. Troost] has been involved in," and that Mrs. Troost helped "individuals linked to Timchenko and other prominent Russian businessmen in sanctions evasion":

**Proposal Regarding Guest Posting On Your Sites**
8 messages

**Julia Marketing** <juliamarketing5@gmail.com>                              Thu, Sep 05, 2024 at 4:28 PM
To: Ann Netpeak <ann.netpeaklinkbuilder@gmail.com>

Dear Anna,

I hope this message finds you well.

I am reaching out regarding a new project for the month of September. I have identified 30 sites where I would like one article to be published on each. The allocated budget for this project is $30,000. I would appreciate it if this task could be completed at the earliest possible convenience.

**Here is the Article:** https://docs.google.com/document/d/1nug0BUhKO2NEjrKvMb0QA5V1N85RN
zosWobZU_1pAp8/edit?usp=sharing

**Here are the websites**

1. https://cnnbusiness.co.uk/
2. https://pixwox.co.uk
3. https://tubegalore.uk
4. https://mygroundbiz.co.uk
5. https://coreinsider.co.uk
6. https://journaloption.com
7. https://newadvent.co.uk
8. https://itsrevolve.com
9. https://themotlefools.com
10. https://atechpost.com
11. https://choouzi.com
12. https://homeoutsider.com
13. https://entrepreneursbreak.com
14. https://celebhunk.com
15. https://ultravibes.co.uk
16. https://lightroomapks.org/
17. https://atozpoetry.com
18. https://sbhinter.com/
19. https://atozpoetry.com
20. https://lightroomapks.org
21. https://techktimes.co.uk
22. https://jbms360.com/
23. https://mybeautifuladventures.com
24. https://englishlush.com/
25. https://whatiscultures.com
26. https://atechpost.com/
27. https://celebhunk.com/
28. https://pixwox.co.uk/
29. https://www.nvbreaking.com
30. https://abusinessventure.com

Please let me know if you require any additional details or have any questions. I look forward to your response.

Kind regards,
**Julia**

COMPLAINT

174.    The fees were paid in cryptocurrency, and on around September 15, 2024, the article was published on cnnbusiness.co.uk and dozens of other sites, some of which were not connected to the group operating cnnbusiness.co.uk.

175.    Similar content referring to Mrs. Troost as a Russian stacking doll also started appearing on various apparently AI-generated videos on the Internet.

176.    On September 30, 2024, a page on the sanctionnielstroost.com website linked to the cnnbusiness.co.uk "Russian nesting dolls" article in support of its claim that Mrs. Troost was "a perfect person for laundering money."

177.    CNN Business later confirmed that a third party, identified as "Ann Netpeak," using the email address "ann.netpeaklinkbuilder@gmail.com," paid it to publish the content about Mrs. Troost alleging her to be "a modern Russian stacking doll," and that "this client has also published the same article on some other friends websites; so far we have seen this article published on many websites. . . The publisher told me that he published the same article on almost 20+ websites."

**Srivastava Unintentionally Connects Himself to the Sites: The Telltale Troost Selfie**

178.    On September 25, 2024, "Elison Turtch" paid Namecheap in crypto to register three domains targeting Mrs. Troost, [her name].org, .net, and .com, the last of which included disparaging statements about Mrs. Troost.

179.    It prominently displayed Mrs. Troost's name in large font above the heading, "A Wife, A Mother, and a Money Launderer," and featured the following graphic, similar in concept to the graphic on the sanctionnielstroost.com website:

1

2

3

4

5

6

7

8

9

10

11

12

13



14    180.   It included images of all three of the Troost children, each of whom had

15  appeared on pages attacking them on the sanctionnielstroost.com website. It also had an

16  image of Mr. Masimore from the jasonmasimore.com website, again directly linking Mr.

17  Masimore (falsely) to a sanctioned Russian oligarch. The site mentioned the Troosts' two

18  daughters' employers and their son's university. This site also misspelled their son's name

19  just like supposed journalists "Emma Klein" and "Lisa Hagen" and the

20  sanctionnielstroost.com website. It also included a photo of Srivastava's former lobbyist,

21  Ankit Desai, who was attacked on the sanctionnielstroost.com website, whom Srivastava's

22  lawyer Charles Adams unsuccessfully tried to discredit with journalists, and whom

23  Srivastava continues to publicly single out for attack on X and in podcasts.

24    181.   [Mrs. Troost].com linked to a connected YouTube channel under the text

25  "Explore the YouTube Channel." One of the videos on the linked YouTube channel

26  alleged that Mrs. Troost was a despicable money laundering sanctions evader. It also

27  featured an image of the Mr. Troost's face pasted on a photo of another man's body. As

28

49

demonstrated below, the photo of Mr. Troost was a reversed, cropped selfie that Mr. Troost had taken and sent only to Srivastava by WhatsApp on November 11, 2022:



Original Selfie          Reverse Image          YouTube

182.    To be clear: Srivastava was the only person to whom Mr. Troost sent this unflattering photo of himself. In their text exchange, Mr. Troost remarked that the photo made him look fat. Srivastava responded with his catchphrase: "God Bless." By using this photo only he had, Srivastava unwittingly unwound all the hard work he and his team did to attempt to preserve his anonymity as the person responsible for the Defamatory Sites.

183.    In December 2024, Srivastava's crisis communications representative advised him to "play clean," meaning he should not be seen publicly accusing Mr. Troost of waging a disinformation campaign against him while he was doing the same against others. (Ex. 1 at ¶ 253). Consequently, in January 2025, Srivastava had his team decommission all the Defamatory Sites. But by then, however, the damage had been done.

184.    By this lawsuit, Mr. Masimore seeks to hold Srivastava accountable for his reprehensible conduct.

## FIRST CLAIM FOR RELIEF
### (Defamation)

185.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

186.    Srivastava published or caused to published the following statements on sanctionnielstroost.com that were of and concerning Plaintiffs, and readers reasonably understood the references therein to be references to them:

(a)    "What is important to understand here is the real role Mr. Masimore plays in the global corruption scenario. He is not just a lawyer; he also commits crimes";

(b)    An image of Mr. Masimore and arrows that directly link him to sanctioned Russian oligarch Gennady Timchenko and Yevgeny Prigozhin, former leader of the paramilitary terror organization Wagner Group, with the caption: "Niels Troost And His Associates Who Assist Him In His Shady Deals."

187.    The foregoing statements are unprivileged, false, and defamatory. Mr. Masimore does not commit crimes, and he has no connections of any kind to Gennady Timchenko, Yevgeny Prigozhin, or the Wagner Group.

188.    Srivastava published or caused to published the following statements on jasonmasimore.com that were of and concerning Plaintiffs, and readers reasonably understood the references therein to be references to them:

(a)    "The Legal Boundaries and Ethical Violations of Jason Masimore";

(b)    "According to the law, lawyers in the UK are not allowed to offer legal services to people who are under financial sanctions. . . . By representing sanctioned clients, Masimore not only violates laws but also undermines the legal system's integrity."

189.    The forgoing statements are unprivileged, false, and defamatory. Mr. Masimore has not violated any legal ethics nor any laws related to the representation of sanctioned individuals. (In fact, Mr. Masimore is neither a UK-qualified lawyer nor a UK citizen. Moreover, UK lawyers are permitted to provide legal representation to sanctioned people and entities.)

190.    The foregoing statements that Srivastava caused to be published on

sanctionnielstroost.com and jasonmasimore.com exposed Plaintiffs to hatred, contempt, ridicule, obloquy, and/or caused them to be shunned or avoided and tended to injure them in their occupation.

191.   As a direct and proximate result of Srivastava's above-described conduct, Plaintiffs have suffered general and special damages in an amount to be determined at trial but believed to be in excess of the minimum jurisdiction of this Court, including without limitation, damages to their business, occupation, reputation, and standing in the community.

192.   Srivastava's conduct was done with oppression, fraud and malice that justifies an award of punitive and exemplary damages.

193.   Unless enjoined and restrained by the Court, Srivastava will republish, repeat and continue to disseminate the statements to the continuing injury of Plaintiffs; that such continued republication, repetition and dissemination of the defamatory and offensive falsehoods will cause irreparable harm to Plaintiffs by damaging their reputation and adversely affecting their and business efforts. Plaintiffs lack an adequate remedy at law insofar as damages will be very difficult to calculate for such ongoing injuries. By reason of the foregoing, Plaintiffs are entitled to a permanent injunction enjoining and restraining Srivastava, and all persons acting in concert with him, from republishing, repeating, distributing or otherwise disseminating the defamatory statements.

## SECOND CLAIM FOR RELIEF
### (False Light Invasion of Privacy)

194. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

195. Srivastava published the statements that are set forth in Paragraphs 181 and 183 herein. The statements were of and concerning Plaintiffs, and readers reasonably understood the references therein to be references to them.

196. The statements were widely publicized by Srivastava.

197. The statements were unprivileged and false. The statements exposed Plaintiffs to hatred, contempt, ridicule, obloquy, and/or caused them to be shunned or avoided and tended to injure them in their occupation.

198. To the extent that all or any part of the statements as a whole or any of the statements within them are found not to be defamatory of Plaintiffs, they place Plaintiffs in a false light which would be highly offensive to a reasonable person.

199. As a direct and proximate result of Srivastava's above-described conduct, Plaintiffs have suffered general and special damages in an amount to be determined at trial but in excess of the minimum jurisdiction of this Court, including without limitation, damage to their business, occupation, reputation, and standing in the community.

200. Srivastava's conduct was done with oppression, fraud, and malice that justifies an award of punitive and exemplary damages.

201. Unless enjoined and restrained by the Court, Srivastava will republish, repeat and continue to disseminate the statements to the continuing injury of Plaintiffs; that such continued republication, repetition, and dissemination of the defamatory and offensive falsehoods will cause irreparable harm to Plaintiffs by damaging their reputation and adversely affecting their business efforts. Plaintiffs lack an adequate remedy at law insofar as damages will be very difficult to calculate for such ongoing injuries. By reason of the foregoing, Plaintiffs are entitled to a permanent injunction enjoining and restraining Srivastava, and all persons acting in concert with him, from republishing, repeating, distributing or otherwise disseminating the statements, to the extent such are found in the action to be false and/or to portray Plaintiff in a false light.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an award as follows:

1.    For actual and compensatory damages in an amount to be determined at trial;

2.    For exemplary and punitive damages;

3.    For a permanent injunction enjoining and restraining Srivastava, and all persons acting in concert with him, from republishing, repeating, distributing or otherwise disseminating the false statements;

4.    For an order requiring Srivastava to assign the domain names jasonmasimore.com, .net and .org to Mr. Masimore;

5.    For costs of suit herein incurred;

6.    For interest on any monetary award to Plaintiffs at the legal rate; and

7.    For such other and further relief as the Court may deem just and proper.


Dated:    August 12, 2025                    NOLAN HEIMANN LLP


                                  By: */s/ Jordan Susman*
                                      Jordan Susman
                                      Douglas E. Mirell
                                      Jane Davidson
                                      Attorneys for Plaintiffs
                                  Jason Masimore and Brodbecks Law, PLLC

COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands a trial by jury on all issues so triable in accordance with Federal Rule of Civil Procedure 38(b).


Dated:       August 12, 2025                    NOLAN HEIMANN LLP


                              By: */s/ Jordan Susman*
                                  Jordan Susman
                                  Douglas E. Mirell
                                  Jane Davidson
                                  Attorneys for Plaintiffs
                              Jason Masimore and Brodbecks Law, PLLC

COMPLAINT